**[Cite as *State v. Cross*, 2020-Ohio-1039.]**

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28392 |
| | : | |
| v. | : | Trial Court Case No. 2018-CRB-3178 |
| | : | |
| TERRANCE L. CROSS | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of March, 2020.

. . . . . . . . . . .

ANDREW D. SEXTON, Atty. Reg. No. 0070892, City of Dayton Prosecutor's Office, 335
West Third Street, Room 390, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

BRYAN K. PENICK, Atty. Reg. No. 0071489, 1900 Kettering Tower, 40 North Main Street,
Dayton, Ohio 45423
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Terrance L. Cross appeals from his conviction following a bench trial on a charge of criminal trespass, a fourth-degree misdemeanor.

{¶ 2} In his sole assignment of error, Cross challenges the trial court's denial of his pretrial suppression motion.

{¶ 3} The record reflects that Dayton police officer Stephen Lloyd and his partner, Wayne Hammock, were patrolling the DeSoto Bass apartment complex on the evening of May 29, 2018. While doing so, they observed a group of five to seven people "loitering" in front of an apartment. (Tr. at 6.) The officers approached the group on foot and asked what they were doing. (*Id.* at 7.) According to Lloyd, the officers explained that they were members of a Greater Dayton Premier Management task force and that they wanted to speak to group members because they were "in a large group."[1] (*Id.* at 7-8.) At the suppression hearing, Lloyd testified that he and Hammock did not order the group members to do anything. Rather, the officers requested identification from everyone. (*Id.* at 17.) Lloyd testified that Cross orally provided his name and Social Security number. (*Id.* at 8.) Prior to obtaining this information, the officers did not draw their weapons, touch Cross, yell at him, or give any commands. (*Id.* at 8-9.) After obtaining the information from Cross, Hammock processed it at the police cruiser and discovered that Cross had been "trespassed" from the property. As a result, the officers arrested him for criminal trespass. (*Id.* at 10.)

{¶ 4} On cross-examination, Lloyd stated that the police dispatch center had

---

[1] The record reflects that the DeSoto Bass apartments are owned by Greater Dayton Premier Management, which contracts with the Dayton Police Department to patrol the complex. (Tr. at 6.)

characterized the incident as a "subject stop." (*Id.* at 16.) Lloyd described a "subject stop" as "stopping of individuals." (*Id.* at 15.) He agreed with defense counsel's characterization of a "subject stop" as stopping someone and saying something like, "Hey you, I need to talk to you," or "Sh[ow] me some identification or tell me who you are[.]" (*Id.* at 15-16.)

{¶ 5} Defense counsel then called Officer Hammock to testify. Hammock agreed that he had written a police report referring to the incident as a "subject stop" on all of the people standing outside the apartment. (*Id.* at 21.) He opined that a "subject stop" can be consensual or non-consensual depending on the circumstances. (*Id.*) Hammock testified that he and Lloyd did not witness any illegal activity at the time of the incident.

{¶ 6} The next witness at the hearing was Cross. He testified that he had come to the apartment complex to see his mother and that he was about to leave when he encountered the officers. (*Id.* at 25.) According to Cross, he had exited his mother's apartment and was heading to his car when Lloyd ordered him to "stop." (*Id.* at 25, 28.) Cross testified that he stopped because the officer told him to do so. Otherwise, he would have proceeded to his car and left. (*Id.* at 26.)

{¶ 7} Following Cross's testimony, the State called Officer Hammock in rebuttal. Hammock testified that he never told Cross to "stop." He also stated that he did not hear Lloyd give such an order. (*Id.* at 31-32.)

{¶ 8} Based on the evidence presented, the trial court overruled Cross's suppression motion. (Decision and Entry, March 13, 2019.) It credited the officers' testimony and agreed with the State's position that the interaction between Cross and the officers was a consensual encounter during which Cross voluntarily identified himself. (*Id.*) The case proceeded to a bench trial, and the trial court found Cross guilty of criminal

trespass, a fourth-degree misdemeanor. The trial court imposed a jail sentence, which it suspended on condition that Cross stay off of Greater Dayton Premier Management property. In its judgment entry, the trial court also imposed a $50 fine and court costs.[2]

**{¶ 9}** On appeal, Cross challenges the trial court's suppression ruling. He argues that the officers executed an unlawful "subject stop," which constituted an unconstitutional seizure by show of authority and without reasonable articulable suspicion, probable cause, a warrant, or any other legal justification. Based on the belief that he was unlawfully seized at the outset, Cross also asserts that there could not have been any "consensual encounter" during which he voluntarily provided his identifying information.

**{¶ 10}** When ruling on a motion to suppress, " 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' " *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). We must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, we then must determine as a matter of law, without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. Id.

**{¶ 11}** With the foregoing standards in mind, we see no error in the trial court's ruling. Cross's argument is premised on his testimony that Officer Lloyd ordered him to

---

[2] Parenthetically, we note that the record does not reflect Cross's payment of the fine or court costs, thereby negating any potential issue about his appeal being moot.

"stop" and Officer Hammock's reference to the incident as a "subject stop." But the trial court credited the officers' version of events, which included Lloyd's testimony that neither officer gave Cross any orders prior to Cross identifying himself. And the fact that Hammock referred to the incident as a "subject stop" in a police report is not dispositive. The issue is what the officers did during their encounter with Cross, not what Hammock called the incident afterward.

{¶ 12} "Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters are not seizures, and Fourth Amendment guarantees are not implicated. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *Mendenhall* at 554. "A request for identification, in and of itself, is not unconstitutional, and is ordinarily characterized as a consensual encounter[.]" *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002 WL 63196, *2 (Jan. 18, 2002).

{¶ 13} We are unpersuaded by Cross's argument that his encounter with the officers was a non-consensual seizure. The test for a consensual encounter "is an objective one." *State v. Wehner*, 2d Dist. Montgomery No. 27217, 2017-Ohio-2788, ¶ 10, citing *State v. Jirac*, 2d Dist. Montgomery No. 27003, 2016-Ohio-8187, ¶ 10. "The focus is on the officer's conduct, not the defendant's subjective state of mind." *Id.*; *see also California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690 (1991) ("*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his

movement, but whether the officer's words and actions would have conveyed that to a reasonable person."). Factors that might indicate a non-consensual encounter "include the threatening presence of several police officers, the display of a weapon, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be required, approaching the person in a nonpublic place, and blocking the citizen's path." *State v. Cosby*, 177 Ohio App.3d 670, 2008-Ohio-3862, 895 N.E.2d 868, ¶ 13 (2d Dist.).

**{¶ 14}** Having reviewed the suppression-hearing transcript, we see nothing either officer did that would support an objective belief Cross was not free to decline Lloyd's request for identifying information.[3] The trial court assessed witness credibility and plainly credited the officers' version of events, including their denial that they told anyone to "stop" and their testimony that they did not draw weapons, touch Cross, yell at him, or issue any commands. Based on the officers' version of events, they simply approached the group of people gathered outside the apartment and requested identifying information. In light of the trial court's acceptance of this testimony, we see nothing either officer did that would cause a reasonable person to believe he was not free to refuse the request. Therefore, the trial court did not err in accepting the State's argument that the encounter was consensual and that Cross voluntarily provided the officers with his identifying

---

[3] On appeal, Cross suggests that the officers parked their cruiser behind a red car as he was attempting to get into the car to leave. (Appellant's brief at 2-4, 8.) This argument appears to imply that the officers blocked Cross and prevented him from leaving. As set forth above, however, the suppression-hearing testimony was that the officers spoke to Cross as part of a group outside of an apartment, not as he was trying to enter a car. In addition, a police cruiser recording that was played during the suppression hearing shows that the officers parked behind and to the side of the red car on a street and that the red car was not blocked in.

information. Cross's assignment of error is overruled.

{¶ 15} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., concurs.

DONOVAN, J., dissents:

{¶ 16} Cross's mere presence on Greater Dayton Premier Management property does not suspend the protection of the Fourth Amendment. Nor does the fact that 4-6 other individuals were present. This was a holiday weekend, and it was still daylight at 8:30 p.m., as established by the video footage (post-detention). There was no basis to suspect Cross of misconduct, hence "the balance between the public interest and his right to personal security and privacy tilts in favor of freedom from police interference." *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357. In addition to the lack of specific and articulable facts upon which to base the initial approach and stop, Officer Lloyd indicated he "just wanted to talk." A reasonable person could assume he was not free to leave at that point.[4]

{¶ 17} Cross and the others were not entitled to less Fourth Amendment protection because of their geographic location alone. "The character of the neighborhood should not be considered in reviewing the reasonable suspicion determination unless the behavior of the suspect is not common among persons engaged in law-abiding activity at the time and place observed. Such an approach limits the risk that the character of the

---

[4] Notably, the officers own written police report in the narrative section indicates Cross was "stopped." Furthermore, Officer Hammock testified that he and Officer Lloyd did not witness any illegal activity at the time of the encounter.

neighborhood makes every resident of a high-crime area 'stop-eligible' and meaningfully enforces the requirement that particularized suspicion justify a police stop." Margaret Raymond, *Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion,* 60 Ohio St. L.J. 99, p. 99 (1999).

{¶ 18} At the time the three officers interacted with Cross and the others, there was no evidence of violation of any law, nor was there evidence adduced that a loitering policy at the property had been violated. The policy was not described and the officers did not observe the individuals for several minutes nor did they attest they were congregating. The officers did not observe any overt act by Cross at the time, did not describe any contact between Cross and the others, and did not indicate their proximity to one another. "Definitiveness is decidedly avoided so as to allow the net to be cast at large." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 165, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). "The officers' actions in this matter were precisely the type of conduct that courts throughout the state have routinely struck down as unconstitutional fishing expeditions." *State v. Griffin,* 133 Ohio App.3d 490, 495, 728 N.E.2d 1097 (6th Dist.1999).

{¶ 19} I would find the police did not have reasonable suspicion based on articulable facts to detain and conduct the initial investigation of Cross. "While the danger to the community and police officers in locations labeled 'high crime areas' cannot be minimized, we must also recognize that 'an average person who lives or works in a high-crime neighborhood [must] be sure whether just standing on the street in front of his or her home or workplace might 'manifest' something illegal." *Akron v. Rowland,* 67 Ohio St.3d 374, 383, 618 N.E.2d 138 (1993). In the words of Benjamin Franklin, "Those who would give up essential liberty to purchase a little temporary safety, deserve neither liberty

nor safety." I would reverse.




Copies sent to:

Andrew D. Sexton
Bryan K. Penick
Hon. Daniel G. Gehres